U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2017 AUG 30 AM 10: 29
CLERK
BY ⎯⎯⎯
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JAMES SHAPPY, III, )
)
Plaintiff, )
)
v. ) Case No. 5:16-cv-108
)
NANCY A. BERRYHILL, Acting )
Commissioner of Social Security,[1] )
)
Defendant. )

## OPINION AND ORDER
### (Docs. 6, 15)

Plaintiff James Joseph Shappy, III brings this action under 42 U.S.C. § 405(g), requesting reversal of the decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB"). Pending before the court is Mr. Shappy's motion to reverse the Commissioner's decision (Doc. 6) and the Commissioner's motion to affirm (Doc. 15). For the reasons stated below, the court GRANTS Mr. Shappy's motion to reverse and DENIES the Commissioner's motion to affirm.

### Background

Mr. Shappy, born in 1967, applied for DIB benefits on April 2, 2014, alleging a disability onset date of March 14, 2013. (AR 21, 45, 201.) The claim was denied initially on July 10, 2014, and on reconsideration on September 22, 2014. (AR 21, 154, 159.)

Mr. Shappy testified at a hearing before an ALJ on June 16, 2015. (AR 21, 42.) Mr. Shappy attended school through tenth grade and later obtained a GED. (AR 46.)

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[1] The court has amended the caption to reflect the current Acting Commissioner of Social Security, who assumed office on January 20, 2017. *See* Fed. R. Civ. P. 25(d).

Mr. Shappy testified that his disability began in March 2013, when he took a significant electric shock when he was changing a motor switch in a large chilling system. (AR 47.) He was standing on a plastic bucket, and fell, hitting his head and injuring his back. (AR 47.) He was shocked again a few days later when he had gone back to work. (AR 58.) The second shock was less severe. (AR 58.) He damaged discs in both his neck and his back, and later had to have spinal fusion surgery. (AR 47.)

Mr. Shappy's issues with his back and neck have never fully resolved. (AR 48, 50.) He stated that he continues to have back pain which is "off the charts," and that he has pain in his neck and down his left arm and into his left hand. (AR 50.) He has to continuously alternate positions throughout the day, and can sit for only about 10 or 15 minutes at a time. (AR 52.) He said that his pain "doesn't go away" and that "[t]here's really nothing that alleviates it." (AR 52.)

Mr. Shappy testified that his neck issues have also caused "issues in my left arm with numbness and motor skills and my left hand." (AR 48.) He also said that since he had begun to use a walker, he had developed carpal tunnel in his left hand from "[p]icking myself up from a sitting position." (AR 48.) His carpal tunnel syndrome has made his penmanship less legible and made it hard to pick things up off the ground and to drive, because it causes numbness in his arm. (AR 50.) He testified that he could drive, but "over a 20, 25 mile ride, . . . I need to basically stop and stretch." (AR 50.)

Mr. Shappy also said that he suffered from polyneuropathy in his feet. (AR 48.) Since his back surgery, he has had numbness in his feet that has "progressively gotten worse" and that is constant. (AR 48, 50.) Electrodiagnostic studies have found nerve damage in his feet. (AR 48.) He has balance issues and "issues standing for any period of time," so he prefers to

keep his walker close by. (AR 48.) While he does occasionally walk without it, it is typically with either the assistance of his girlfriend or by using a wall for support. (AR 48.) If he spends too much time on his feet, they will swell, and he has to spend a few days in bed to get the swelling down "in order to be functional again." (AR 53.) He estimated that he could spend 15 minutes of every hour or two hours on his feet. (AR 54.) He spends a lot of time in bed during the day and he says that lying down is helpful, especially with the neuropathy in his feet. (AR 53.)

Mr. Shappy testified that the walker was issued to him right after his spine surgery. (AR 49.) He said that, while he is embarrassed to use the walker because it makes him "feel like an invalid," he feels he is danger of falling without his walker. (AR 54.)

Mr. Shappy also testified to a history of mental illness, specifically depression and substance abuse. (AR 50–51, 55.) His son passed away four years before the hearing, and he said that his brain replays the mistakes he has made in his life "over and over and over." (AR 57.) He attempted suicide in 2011. (AR 55, 392.) He also stated that, while he had previously struggled with drug abuse, including prescription pain pills, cocaine, and heroin, he stated that he had no such problems at the time of the hearing. (AR 50–51, 55.) He said that since his injury 2013, he had "stayed clean most of the time," and especially since beginning pain management. (AR 56.) His mental illness makes it hard for him to concentrate, and says that he has both "lost interest in everything" and can "immediately get overwhelmed." (AR 57.)

Mr. Shappy also testified that he had gained 50 pounds since the injury, and currently weighed 370 pounds. (AR 53.) He said that he gained weight because of a lack of exercise, depression, and emotional stress. (AR 53.)

3

A vocational expert, Lynn Paulson, also testified at the hearing. (AR 60–66.) She answered questions posed by both the ALJ and Mr. Shappy's attorney regarding whether a hypothetical worker with specified limitations could perform either Mr. Shappy's past work or other work in the national economy. (AR 61–65.)

## ALJ Decision

The ALJ is required to follow the five-step process in determining a claimant's disability. *Machia v. Astrue*, 670 F. Supp. 2d 326, 333 (D. Vt. 2009) (internal citation omitted); *see* 20 C.F.R. § 404.1520. The answer at each step determines if the next step must be addressed. *Machia*, 670 F. Supp. 2d at 330. At the first step the ALJ determines if the claimant has engaged in substantial gainful activity since the alleged onset date of his disability. *Id.* If the answer is no, step two then asks if the claimant has any "impairments" that are "severe." *Id.*

If there is one or more severe impairment, step three evaluates whether any of these impairments meet the listed impairments in Appendix 1 of the regulations; if an impairment meets the listing the claimant is deemed disabled. If it does not, step four asks whether the claimant retains the residual functional capacity ("RFC") to do his past relevant work. *Id.* If the claimant can no longer do his past relevant work, step five asks whether the claimant is able to do any job available in significant numbers in the national economy. *Id.* "The claimant bears the burden of proving his case at steps one through four, . . . and at step five, there is a 'limited burden shift to the Commissioner' to 'show that there is work in the national economy that the claimant can do.'" *Larkin v. Comm'r of Soc. Sec.*, No. 2:10-CV-291, 2011 WL 4499296, at *2 (D. Vt. Sept. 27, 2011) (quoting *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)).

At step one, the ALJ determined that Mr. Shappy had not engaged in substantial gainful activity since March 14, 2013, his alleged onset date. (AR 23.) At step two, he found that Mr. Shappy had the following severe impairments: obesity, degenerative disc disease, peripheral

4

neuropathy, left carpal tunnel syndrome, sleep apnea, depression, anxiety, a personality disorder, and polysubstance abuse. (AR 24.) At step three, the ALJ found that none of Mr. Shappy's impairments, either alone or in combination meet or medically equals the severity of a listed impairment. (AR 24.)

The ALJ determined that Mr. Shappy had an RFC to perform light work with certain limitations. (AR 26.) In an eight-hour work day, Mr. Shappy could stand or walk for two hours and sit for six hours, he could never climb ladders, ropes, or scaffolds, he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, he could occasionally push and pull with his lower extremities, and he could occasionally reach overhead with his left upper extremity, but could frequently handle and grasp with it. (AR 26.) Mr. Shappy was further limited to simple, unskilled work in a low stress environment—"requiring little to no change in the work setting and little to no need for the use of judgment." (*Id.*) He could maintain attention and concentration for two-hour periods during the day, and, while he should avoid interaction with the general public, he could "sustain brief and superficial social interaction with coworkers and supervisors." (*Id.*)

At step four, the ALJ found that, with this RFC, Mr. Shappy could not perform any past relevant work. (AR 33.) At step five, the ALJ concluded that sufficient jobs existed in the national economy that Mr. Shappy could perform, including "inspector/hand packer," "merchandise marker," and "touch-up screener." (AR 34.) The ALJ therefore concluded that Mr. Shappy was not disabled. (AR 35.)

The Appeals Council denied review on February 25, 2016. (AR 1.) The complaint in this case was filed on April 19, 2016. (Doc. 3.)

## Standard of Review

Disability is defined by the Social Security Act in pertinent part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

When considering the ALJ's disability decision, the court "review[s] the administrative record de novo to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The decision is subject to a factual review determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981); *see also, e.g., Johnson v. Comm'r of Soc. Sec.*, No. 2:13-cv-217, 2014 WL 2118444, at *3 (D. Vt. May 21, 2014).

## Analysis

Mr. Shappy raises two arguments on appeal. First, he contends that the ALJ improperly relied on a gap in the record when he concluded that Mr. Shappy did not meet Listings 1.04 and 11.14, and that the ALJ instead should have sought additional evidence from Mr. Shappy's treating physician, Dr. Timothy Lishnak. (Doc. 6 at 8–11.) Second, he contends that the Appeals Council should have considered an additional statement by Dr. Lishnak that Mr. Shappy submitted after the ALJ's decision. He further asserts that the Appeals Council's failure to consider this evidence, along with regulations regarding the submission of evidence to ALJs generally, violate the Due Process Clause. (Doc. 6 at 11–16.)

I.  **Substantial Gap in the Evidence**

Mr. Shappy argues that there was a clear gap in the record: whether Dr. Lishnak or other treating sources believe that he could ambulate effectively without a walker—a crucial issue in the ALJ's conclusion at step three that Mr. Shappy did not meet either Listing 1.04, Disorders of the Spine, or Listing 11.14, Peripheral Neuropathy. (Doc. 6 at 9.) He contends that, before he concluded that Mr. Shappy could ambulate effectively, the ALJ should have requested an opinion on the matter from Dr. Lishnak. (*Id.* at 11.)

A.  **Relevant Evidence in the Record**

The court begins with the record, reciting only those parts related to the ALJ's determination that Mr. Shappy can ambulate effectively without a walker. After the accident in March 2013, Dr. Lambro Demetriades, an orthopedist in New Jersey, diagnosed him with degenerative disc disease in both his cervical and lumbar spine, and an MRI revealed disc herniation at L5-S1 and L4-L5. (AR 439.) Dr. Demetriades recommended that Mr. Shappy undergo a "two-level lumbar fusion with instrumentation," and the surgery was performed on September 26, 2013. (AR 439, 449.) At several appointments in the summer of 2013, before the

surgery, Dr. Demetriades noted that Mr. Shappy had a normal gait and did not note any use of a walker for ambulation. (AR 434, 438, 446.)

Following his surgery, Mr. Shappy moved to Vermont, though he continued to follow-up with Dr. Demetriades in New Jersey. Dr. Demetriades ordered Mr. Shappy out of work until January 22, 2014, when he placed Mr. Shappy on light duty restrictions and prescribed a cane for his assistance. (AR 418–20.) He noted that, though Mr. Shappy had "normal strength and reflexes in both lower extremities," he continued to "have numbness and dysesthesias in both his feet." (AR 419.) At a follow-up in February 2014, an examination revealed that he had "normal strength and sensation in both lower extremities." (AR 416.) Dr. Demetriades commented, however, that he did "not feel that Mr. Shappy will ever be able to return to full activities due to the fact that he will [have] some ongoing pain. I had a long talk with [him] and I recommended that he consider a change of career or possibly retirement [or] disability." (*Id.*)

On March 17, 2014, Mr. Shappy fell on some ice. (AR 467.) He made several visits to the emergency room and to doctors. Notes from his visit to the ER that day state that he initially "was unwilling to get off [his] back and [was] in [a] stretcher." (AR 481.) After he received IV narcotics, he was able to ambulate to the bathroom, although with the help of a walker and the assistance of two emergency medicine technicians. (AR 475, 481.) He required the walker for another trip to bathroom, and a note states that he "ambulate[d] slow[ly], but did not look like he was under distress while walking and talking." (AR 476.) He was later discharged "ambulatory with a normal gait" and in no apparent distress. (*Id.*)

He saw a family practice physician on March 20, 2014. (AR 467.) The doctor noted that he walked with an antalgic gait and had tenderness over his lumbar spine. (AR 468.) He returned to the ER on March 22, 2014. (AR 485.) He "[w]alk[ed] to Triage slowly with [a]

8

cane." (AR 485.) He complained that he had had increased pain since his back surgery and had had "chronic numbness in both of his feet." (AR 486.) After receiving some pain medication, he was eventually discharged in a wheelchair. (AR 485, 488.)

Mr. Shappy traveled to New Jersey and saw Dr. Demetriades again on March 25. (AR 412.) The doctor noted that an examination of his lower back showed "pain and cramping," but that he had "normal strength and sensation in all four extremities." (AR 413.)

In summer 2014, Mr. Shappy saw three primary care physicians. (AR 668–94.) Dr. Jesse Coenen saw Mr. Shappy on June 12, 2014, and concluded that Mr. Shappy was unable to work for the next two months because of both his back pain and depression. (AR 670.) Dr. Stanley Hunter saw Mr. Shappy on June 30 and noted in his examination that Mr. Shappy had a normal range of motion and no edema or tenderness. (AR 677.) Dr. Lishnak saw Mr. Shappy on July 31, and Mr. Shappy complained of the "worst pain ever" in his back, neck, and feet. (AR 680.) He reported swelling in his feet that had gotten worse recently, and that he has tingling and numbness in both feet. (AR 686–87.) In his physical examination, Dr. Lishnak noted that Mr. Shappy had 2+ pitting edema in his bilateral lower extremities. (AR 688.)

On August 4, 2014, Mr. Shappy saw Dr. Nomaan Ashraf, a spinal surgeon, and Dr. Jonathan Lester, a physical medicine and rehabilitation doctor. (AR 620, 626.) Mr. Shappy complained of back pain and numbness in both feet. (AR 620.) On examination, Dr. Ashraf noted that Mr. Shappy's lumbar range of motion was diminished by 50%, that he had pain with forward flexion or extension of his lumbar spine, and that Mr. Shappy had normal sensation and strength in both legs. (AR 621.) Dr. Ashraf ordered a CT scan of the lumbar spine and nerve conduction studies of Mr. Shappy's lower extremities. (AR 622.) Dr. Lester also noted that

9

Mr. Shappy's lumbar flexion was markedly limited, but that he had both normal strength and sensation in his lower extremities. (AR 627.)

The CT of the lumbar spine, performed August 29, 2014, revealed no hardware failures from his back surgery or definite central canal stenosis, but did show some disc degeneration and foraminal narrowing. (AR 653.) On September 26, 2014, Dr. Timothy Fries performed nerve conduction studies in Mr. Shappy's lower extremities. (AR 787.) Dr. Fries found evidence of abnormalities in the conductions that were "very consistent with a polyneuropathy with predominantly axonal features." (AR 788.) He also noted "fairly prominent denervation of the tibialis anterior," and noted that this raised the possibility of an "S1 root lesion." (AR 788.) He commented that "[g]iven the quality and distribution of his current complaints in the feet, it seems likely that his lower extremity problems are primarily related to a polyneuropathy with associated dysesthesias." (AR 788.) Reviewing these tests, Dr. Ashraf stated that Mr. Shappy's symptoms "are primarily related to a polyneuropathy with associated dysesthesias in the legs," but that it did "not appear that the symptoms are causally related to his spine operation." (AR 920.)

In February 2015, Mr. Shappy returned to Dr. Lishnak. (AR 854.) He reported balance problems, and continued to have leg pain and weakness. (AR 855.) Dr. Lishnak noted in his exam that Mr. Shappy had an "antalgic gait with [the] assistance of [a] rolling walker." (AR 856.) Dr. Lishnak assessed Mr. Shappy with worsening balance stemming from a cardiac arrest in December 2014, and also noted that Mr. Shappy said his leg and neck pain had led him to use the illicit substances which had resulted in the recent overdoses. (AR 857.) On February 25, Mr. Shappy saw Dr. Waqar Waheed, a neurologist. (AR 782.) Dr. Waheed noted that Mr. Shappy had a distal loss of sensation to pin-pricks. (AR 784.) Dr. Waheed noted that

Mr. Shappy's "balance and gait disorder" was "multifactorial," and was due to his "morbid obesity, chronic low back pain, and chronic cervical pain, as well as mild to moderate degree of axonal polyneuropathy." (AR 784.)

On March 10, 2015, Dr. Arthur Becan, an orthopedic surgeon, examined Mr. Shappy for his workers' compensation claim. (AR 932.) Among other findings, he noted from his physical exam that Mr. Shappy "ambulates with a markedly guarded and antalgic gait and uses a walker for ambulation. He exhibits difficulty arising from seated position. He is unable to perform calcaneal or equinus gait." (AR 935, 938.) He assessed Mr. Shappy to have lumbosacral radiculopathy and lumbosacral myositis at an 85% level of total disability for his lumbar spine. (AR 939.) He also assessed cervical radiculitis and myositis, at 70% partial disability, and 32.5% disability for Mr. Shappy's left hand due to carpal tunnel syndrome. (AR 940.)

On March 11, 2015, Mr. Shappy was examined by Dr. Angela Adams, a neurologist, for his workers' compensation claim. (AR 768.) Among other findings, Dr. Adams noted in her physical examination that his "motor strength testing in the bilateral upper and bilateral lower extremities was limited due to pain," and that he "used a walker," "had an antalgic gait," and "carried the back in a stiff and rigid manner." (AR 776.) She diagnosed him with cervical radiculopathy resulting in partial 25% disability, lumbosacral radiculopathy at 40% disability," and an adjustment disorder and depression. (AR 776–77.)

In May 2015, Mr. Shappy returned to Dr. Lishnak, complaining of radicular pain and muscle spasms and stating that "he has been using a walker to help with ambulation." (AR 863.) Dr. Lishnak assessed radiculitis. (AR 865.)

On March 18, 2015, Dr. Lishnak filled out a medical opinion form regarding Mr. Shappy. (AR 797–800.) He listed Mr. Shappy's conditions: depression and anxiety, peripheral

11

neuropathy, carpal tunnel syndrome, shock from electric current, radicular neck and back pain. (AR 797.) He identified Mr. Shappy's symptoms: "low back pain, neck pain, memory difficulty, headaches, feet numbness and tingling, balance difficulty, [and] blurry vision." (AR 797.) He listed bases for his conclusions: the electrical diagnostic studies which showed "axonal sensory motor polyneuropathy," an MRI of his cervical spine and a CT of his lumbar spine which showed "multilevel degenerative changes," and "decreased sensation of feet on exam." (AR 797.) Dr. Lishnak did not fill out the section of the form identifying function-by-function limitations for lifting, posture, and manipulation. (AR 797–98.) Instead, he noted in the margin that he had "not evaluated [Mr. Shappy's functional capacity] by myself," and "recommend[ed] [a] functional capacity evaluation." (AR 797.) He did note that he "suspect[ed]" that Mr. Shappy would be unable to "stay positioned at a work station with a combination of sitting and standing for an 8-hour work day." (AR 799.) On the last page of the form, Dr. Lishnak wrote that Mr. Shappy "may benefit from a functional capacity evaluation," and that the "[b]ulk of my information comes not from direct observation but in review of studies performed and consultant notes." (AR 800.)

### B. The ALJ's Findings

Reviewing these records, the ALJ concluded at step three that Mr. Shappy did not meet Listing 1.04, Disorders of the Spine, or Listing 11.14, Peripheral Neuropathy. (AR 24.) The subsections at issue from each listing require that a claimant be unable to "ambulate effectively" without assistance to meet the listing.[2] The ALJ concluded that the evidence in the record demonstrated that Mr. Shappy *could* ambulate effectively:

---

[2] Listing 1.04 provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral

The record clearly establishes that the claimant is able to ambulate effectively and thus does not meet listing 1.04 or 11.14. The record documents the claimant's "normal casual gait." Although the claimant did use a cane for a period of time, this was after a recent fall. The claimant also occasionally uses a walker out of alleged need, but even counsel acknowledges that the claimant does not always use a walker. *If the claimant were truly as limited as asserted, his treating sources would have at least documented substantial deficits in gait, if not providing a full finding of disability, but neither is documented in the record.* For these reasons, I find that the claimant does not meet or medically equal the criteria of listings 1.04 or 11.14.

(AR 24 (emphasis added and record citations omitted).)

Relatedly, the ALJ explained why he gave no weight to Dr. Lishnak's medical opinion later in his decision:

Notably, I considered the March 2015 medical source statement of treating physician Timothy Lishnak, M.D., who only reports the claimant's subjective

---

fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

. . .

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Ch. 404 Appendix Part 1, Listing 1.04. An "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk," and "generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* Listing 1.00(B)(2)(b).

Although Listing 11.14 does not use the phrase "ambulate effectively," it includes a similar requirement in its definition of peripheral neuropathy, which it defines as:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities[.]

*Id.* Listing 11.14(A). An "extreme limitation in the ability to . . . balance while standing or walking" is defined as being "unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes." *Id.* Listing 11.00(D)(2).

> complaints and then *refuses to rate a residual functional capacity*, rather saying the claimant needs a Functional Capacity Evaluation. This opinion, which merely parrots the claimant's subjective complaints, is afforded no weight as it is not actually a medical opinion provided by Dr. Lishnak. *Dr. Lishnak himself declined to provide any objective, function-by-function opinion.* The lack of any such assessment by any source is persuasive and generally supports the range of light-exertion work cited by the State examiners above.

(AR 32 (emphases added, record citation omitted, and spelling of Dr. Lishnak's name corrected).)

### C. Analysis

An ALJ has an "affirmative duty to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). "'[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Id.* (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (Sotomayor, J.)). And by statute, an ALJ is required to "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" a determination regarding the claimant's disability. 42 U.S.C. § 423(d)(5)(B); *see also Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 537 (S.D.N.Y. 2015) (quoting § 423(d)(5)(B)). Moreover, an ALJ has regulatory authority to order a "consultative examination" to "resolve an inconsistency in the evidence" or "when the evidence as a whole is insufficient to allow" the ALJ to make a decision. 20 C.F.R. § 404.1519a(b). An ALJ's failure "to order a consultative examination when an examination is required for an informed decision" can be reversible error. *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013); *accord Phelps v. Colvin*, 20 F. Supp. 3d 392, 401–02 (W.D.N.Y. 2014).

The court agrees that there is a gap in the evidence that the ALJ should have attempted to fill before concluding that Mr. Shappy is able to ambulate effectively. At step three, the ALJ reasoned that Mr. Shappy's need for a walker to ambulate was not supported by the record

14

because his treating sources did not "document substantial deficits in gait" or "provid[e] a full finding of disability." (AR 24.) In 2013 and early 2014, doctors tended to note either that Mr. Shappy had a normal gait or omit any mention of his gait in their exams. (AR 413, 419, 434, 438, 446, 476.) But by 2015, doctor after doctor (including his treating physician, Dr. Lishnak) noted deficits in Mr. Shappy's gait, characterizing it as an "antalgic gait," a "balance and gait disorder," and a "markedly guarded and antalgic gait." (AR 784, 856, 935.) These reports were supported by the electrodiagnostic tests performed in September 2014 that showed polyneuropathy in Mr. Shappy's feet. (AR 788.) This chronology supports Mr. Shappy's testimony that his gait problems worsened over time.

To the extent the ALJ felt the doctors' statements in 2015 did not constitute a documentation of "substantial deficits in gait," he should have sought additional evidence from Dr. Lishnak or ordered a consultative functional capacity evaluation to resolve any insufficiency or ambiguity in the evidence. *See Garcia v. Colvin*, No. 12-CV-2140, 2014 WL 119433, at *6 (E.D.N.Y. Jan. 10, 2014) (concluding that "ALJ was under a duty to develop the record" before discounting treating physician's second opinion as inconsistent with an earlier opinion where the second opinion and other evidence suggested a condition worsening over time); *cf. Phelps*, 20 F. Supp. 3d at 402 (concluding that "consultative examination was not necessary" where plaintiff's treatment for the alleged impairment at issue was limited to a single treatment note).

This conclusion is bolstered by the ALJ's treatment of Dr. Lishnak's opinion. The ALJ dismissed Dr. Lishnak's opinion as "merely parrot[ing] the claimant's subjective complaints,"

and noted that Dr. Lishnak "refuse[d] to rate [Mr. Shappy's] residual functional capacity" and "declined to provide any objective, function-by-function opinion."[3] (AR 32.)

This is a mischaracterization. First, the opinion does not "merely parrot" Mr. Shappy's complaints. Instead, Dr. Lishnak lists the objective bases for his opinion: an EMG study, a CT scan, an MRI, and clinical findings. (AR 797.) Second, to say that Dr. Lishnak "refused" to rate Mr. Shappy's functional capacity suggests that Dr. Lishnak believed such an evaluation was not worthwhile—perhaps because he believed either that Mr. Shappy was not actually disabled or that he was malingering. While it is true that Dr. Lishnak did not complete the section of the form concerning limitations regarding lifting, posture, and manipulation, he instead wrote in the margin that he "recommend[s]" that Mr. Shappy obtain a functional capacity evaluation. (AR 797.) At the end of the form, the doctor further explained that the "[b]ulk of my information comes not from direct observation[,] but in review of studies performed and consultant notes," and again suggested that Mr. Shappy "may benefit from a functional capacity evaluation." (AR 800.)

These remarks suggest that Dr. Lishnak, who had available to him all of the objective medical tests and clinical findings that would be considered by the ALJ three months later, in fact believed that a functional capacity evaluation *would* be helpful. Where a medical opinion, especially the opinion of a treating physician, suggests that further testing is necessary, this is a compelling reason to either clarify the physician's opinion or order a consultative examination. *See Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (noting that ALJ's "failure to order a consultative examination by an orthopedist even though the SSA's consulting doctor

---

[3] As this court has noted recently, a failure to provide a "function-by-function assessment" is "not a basis for discounting a medical opinion." *Doyle v. Berryhill*, No. 5:16-cv-24, 2017 WL 2364312, at *6 & n.4 (D. Vt. May 31, 2017).

16

recommended such an evaluation" may have violated ALJ's obligation "to order a consultative examination when such an evaluation is necessary for him to make an informed decision," although not basing its "decision on this issue"); *Falcon v. Apfel*, 88 F. Supp. 2d 87, 91 (W.D.N.Y. 2000) (concluding that "ALJ had an obligation to further develop the record and clarify the opinion of the consulting physician" where the consulting physician stated in his report that he needed to review the results of an MRI and a CAT scan to determine if claimant had a herniated disc).

Accordingly, the ALJ in this case had an obligation to further develop the record before concluding that Mr. Shappy could ambulate effectively and therefore that his impairments did not meet or medically equal any listing. The ALJ could have sought clarification from Dr. Lishnak regarding his opinion on Mr. Shappy's ability to ambulate and need for a walker, or the ALJ could have ordered a consultative functional capacity examination, *see* 20 C.F.R. § 404.1519, either conducted by Dr. Lishnak himself, *see* 20 C.F.R. § 404.1519h, or by another qualified medical source, *see* 20 C.F.R. § 404.1519i.

## II. The Appeals Council and Due Process

Mr. Shappy next argues that the Appeals Council erred by failing to consider a letter by Dr. Lishnak that Mr. Shappy submitted after the ALJ's decision and that its failure to do so constituted a denial of due process. (Doc. 6 at 11–16.)[4] Because the administrative record must

---

[4] Dr. Lishnak's letter, written August 20, 2015, states:

> [Mr. Shappy] has several medical conditions which impair his ability to ambulate and [which] have led him to using a walker to ambulate effectively and safely. He has radiculitis (lumbar) and is status post lumbar spinal fusion surgery done in 2013. Additionally he has been documented to have a mild to moderate degree of axonal polyneuropathy which affects the sensation (impaired) in his feet.

(AR 16.)

17

be reopened for further development, the court need not address this argument. In addition to the above directions to the ALJ to develop the record, Mr. Shappy may submit and the ALJ may consider any new evidence as appropriate. *See Thompson v. Astrue*, 583 F. Supp. 2d 472, 475 (S.D.N.Y. 2008) ("Case law recognizes that, in the absence of limiting instructions or court findings, the Commissioner may revisit on remand any issues relating to the application for disability benefits.").

## **Conclusion**

For the reasons stated above, Mr. Shappy's Motion to Reverse the Commissioner's Decision (Doc. 6) is GRANTED, the Commissioner's Motion for Order Affirming the Commissioner's Decision (Doc. 15) is DENIED, and the case is REMANDED for further proceedings consistent with this opinion.

Dated at Rutland, in the District of Vermont, this 28 day of August, 2017.

Geoffrey W. Crawford, Judge
United States District Court